May it please the Court. My name is Derek Tini, and I am arguing on behalf of the petitioners on this petition for review. In December 2021, the Virginia Department of Environmental Quality and the State Water Control Board issued a Water Quality Certification pursuant to Section 401 of the Federal Water Pollution Control Act for Mountain Valley Pipeline's water crossings here in Virginia. This petition for review should be granted and the certification should be vacated because the agencies refused outright to evaluate whether there were preferable locations for MVPs' crossings, they uncritically accepted MVPs' proposed crossing methods, and they inadequately addressed the threat to Virginia's narrative standards. But I want to start this morning with the jurisdictional question the agencies raise. The agencies contend that this Court lacks jurisdiction because petitioners raise the wrong kinds of questions. But the agencies are wrong both about the scope of this Court's jurisdiction and the nature of petitioners' claims. We agree with the State on one point, that in most circumstances, review of Section 401 certifications occurs in State court. But that is not true for 401 certifications for facilities regulated by the Natural Gas Act. For those facilities, like this pipeline, Congress wanted to bypass State court review and therefore prescribed expedited review of State 401 certifications in the Federal Circuit Courts. Section 717RD of the Natural Gas Act gives Circuit Courts original and exclusive jurisdiction to review orders by State agencies acting pursuant to Federal law for natural gas facilities. And as the Third Circuit has observed in the first of the Delaware Riverkeeper cases, that's 833 F3D at 371, a water quality certification cannot exist without Federal law. Here, this certification on its face declares that it was issued pursuant to Section 401 of the Clean Water Act. That's at JA0001. So Virginia issued the certification pursuant to Federal law, giving this Court jurisdiction under the Natural Gas Act. And this Court's jurisdiction under that statute is broad enough or capacious enough, using the words of the Third Circuit, to encompass questions of whether an agency complied with the State provisions that govern its Section 401 program. The statute provides original and exclusive jurisdiction. There is no opportunity to split claims then between Federal and State courts under that language. Okay, so getting beyond jurisdiction, since your argument is that we're here pursuant to Federal law, what is your best argument that the State of Virginia has authority to alter the FERC citing decision, which was based on Federal law? Certainly. So the Virginia program requires an alternatives analysis. And this Court has recognized that such an alternatives analysis flows from the Clean Water Act, because the Clean Water Act is replete with such requirements, such as in the 404B1 guidelines. And that's the Mountain Valley Pipeline versus North Carolina Department of Environmental Quality case. So the Virginia program requires this alternatives analysis. One of the questions they have to ask is whether there are better sites. And so, therefore, they were required to evaluate that. To avoid that evaluation, they cite two statutes. I'm sorry? The whole business of Virginia courts requires this. I mean, it's express law that says the agencies are forbidden altering the sitting determinations. So, I mean, how do you get around that? I mean, it's right there. So to say they require it seems to go in the face of something the statute says otherwise. Those two statutes on which they rely, 21D2 and 81F, don't apply in this situation. Is this pipeline greater than 36 inches? It is. Then how does 21D2 not apply? 21D2 provides that the state cannot alter a siting decision for, quote, such facilities. Which begs the question Such facilities being the gas transmission pipeline that is greater than 36 inches? Respectfully I mean, how are you reading this otherwise? I can't understand it. Certainly. The such facilities are, pardon me, I want to ground myself in the statute. So that brings us back to the beginning of section 21D2. Such facilities, refer back, okay, what kind of facilities? We start at the beginning right after number two. Facilities and activities of the public service companies regulated by FERC or the state except, except for construction of pipelines that are greater than 36 inches. The such facilities includes facilities except for. So an exception clause like that is an essential part of the definition of a class to which such refers. It's not the type of natural break. Under the last antecedent doctrine, when you look for what such facilities is referring to, you have to look to the entirety of it. It's facilities regulated by FERC except for these large pipelines. So that's why the statute doesn't apply. That point is very key. What are such facilities? Do you have any legislative history to support this? The legislative history. From the angle that perhaps there is some ambiguity here. Your law seems to indicate that when your plain text doesn't indicate, you can look at the intent of the legislature. Do you have any such history? I think that if you look at the intent of the legislature, this change, this exception for 36-inch pipelines came up from Senate Bill 950 in 2018. And the entire point of Senate Bill 950 was to increase scrutiny of pipelines greater than 36 inches. The Virginia General Assembly had recognized that its permitting program had generally worked to protect waters, but it was worried about these large pipelines. So it's perfectly consistent with legislative intent for them to carve 36-inch and greater pipelines out from this site alteration provision. So to the extent that we need to look to legislative history, that informs what it means. But the other thing to understand is that even if the statutes were to apply, what they prohibit Virginia from doing is altering a siting location. They do not prevent the agencies from denying a certification. Alter means to change or modify. It does not mean to deny. So just based on the plain language of the statute, even if they were prohibited from altering the siting location, they were still required to deny it if a better location was available. But they were prohibited from altering those upland portions of the large pipelines. Do you agree with that? Doesn't that effectively keep them from altering the siting determinations for the stream crossing portions too? Not necessarily. They can't alter when they're issuing a... So would one not affect the other? There may be some alteration of where the connection is based on the location, but that prohibition on altering upland locations is during the course of issuing the upland certification, which was done in 2018. It's not at this time. The state has the authority to require and is in fact required to examine whether a crossing location has alternatives. And it's within, you know, as this court recognized in Mountain Valley Pipeline v. North Carolina and as the Constitution Pipeline case out of the Second Circuit says, that it's well within the scope of a state's power to regulate the location of a water crossing. And if there were any question about this altering versus denial issue, then Section 81H would answer that question. And that comes immediately after that upland prohibition that you were talking about, Judge Winn. It says nothing in this section shall restrain the state's authority to deny a certification. But isn't 81H really just about ensuring that the agencies take some action on these upland permits for long-pipe pipelines, even if that's a denial? I believe that's one way to read it. But if it is a denial, they can deny one of the reasons available to them to deny, which comes from the Virginia Water Permit Program, is an absence of sufficient avoidance and minimization. It says nothing in this section shall be construed to prohibit the denial of a certification. You're saying 81H has this loophole is created for 81F. There's no such provision under Section 21 saying that? I don't think it's necessary. In other words, you don't have a similar loophole for Section 21 reviews? I don't think it's necessary because what 81H tells us is what altering means. What 81H is telling us is when the General Assembly prohibits altering, altering does not mean denial. And because the same word alter is used in both 81F and 21D2, its meaning must be the same in both locations. There's no similar provision for this in Section 21. That is correct. There is no similar provision to 81H. Doesn't that make a difference? I mean, it looks like you ought to have that same kind of loophole for Section 21 reviews if you're going to carve out one for 81H. I don't think it's necessary, again, because of the well-established principle that when the General Assembly uses a word in one part of the statute, it means the same throughout. When 81H provides context for what alter means, it also provides context for what alter means in 21D2. The agencies retain the authority to deny a certification where the location is not the most preferable. But that was not the only flaw here. The other important flaw that this Court should take a hard look at is that the agencies uncritically accepted Mountain Valley's preferred crossing methods as the least environmentally damaging practical alternatives, notwithstanding numerous red flags in the record. Rather than examine MVP's alternatives analysis in Table 15 with scrutiny and explaining their acceptance of it, the agencies blindly accepted it with the permit writer telling the Board in his own words, but in the crossing analysis for the table. What's our review here? Your review? What's the question you're bringing up? What's the review?  We looked closely at the data provided, including hundreds of crossings that were not statutorily required to be evaluated. Well, because they voluntarily required those, we haven't briefed the issue of whether they were required to. But we know at least some of these crossings they had to take a look at. But when they look at hundreds, they look at data that's provided and then these hundreds of crossings. I mean, our review is arbitrary and capricious. Yes. It's pretty high. Well, it's arbitrary and capricious for an agency, whether it's a federal or a state agency. I understand. Right. It's arbitrary and capricious when they fail to examine contrary evidence in the record or they entirely fail to consider. You're saying they entirely fail to consider everything that you wanted them to consider. Yes. What is your best argument on that? What's your best point that they completely ignored something in these? I mean, it looks like they considered 8,000 comments and asked clarifying questions and followed up. So what is the worst thing they did in your view? Well, 7,500 of those 8,000 comments were apparently form letters. But of the comments, they ignored expert critical commentary of Table 15. That Table 15 was inconsistent, that there were places like the Blackwater where they said that a 39-foot boar pit was too deep and at least four other locations where they were going to dig boar pits even deeper, including on the Gauley River. So they ignored expert commentary suggesting. Which, where in the JA is that? Certainly. Whose expert commentary? The expert commentary was submitted by the petitioners and that is the Silvis report at JA 1840. Did they respond to that commentary at all? There is not a word about it. There is not a word in there about the expert commentary. And then what was the JA site? The JA site for the expert commentary is 1840. That's where the Silvis report starts, where she highlights inconsistencies in Table 15 that had to be addressed. They also entirely failed to address MVP's flip-flopping on what methods might be acceptable. There were credibility issues on whether when MVP asserted that certain crossing methods were infeasible and the agencies entirely failed to address that. Is it flipping-flopping or is it re-evaluating based on the information they had? Well, you might excuse it as re-evaluating if all we had were their initial statements like about the Greenbrier, the Gauley, the Elk, which you may recall were at issue in a prior case. It may have been a re-evaluation over the course of years. But with 38 crossings that they certified to FERC were well-suited for conventional boring in November 2020. And then in November 2021, suddenly those were no longer practicable. That starts to undermine any question that it's a re-evaluation. Even if it were a re-evaluation, it calls into question their analysis because they certified to FERC that they were well-suited. And so in the absence of any review of that, and again, this is another example where the agencies entirely failed to consider the questions of MVP's technical analyses, that is arbitrary and capricious, Judge Wynn. Why is that not credibility? Why is that not credibility? We're looking at basically what they did and balancing how they did it. Well, the D.C. Circuit held in the Colorado Fire Sprinkler case that it is arbitrary and capricious to fail to examine questions of whether statements are trustworthy. And while there may be, if the agency had made a credibility determination, maybe we would be in a different posture, right? Maybe there would be some deference to a credibility determination. But they simply ignored that issue and didn't evaluate it until they provided examples in their brief. The final example where they failed to deal with contrary evidence in the record is EPA's comments. EPA submitted comments, and these are in the JA at 535 to 536, two pages, or a page and a half at least, on their criticisms of the least environmentally damaging practical alternatives analysis. The DEQ fundamentally misunderstood what EPA was asking for, saying all that EPA had asked for were some revised costs. That is flatly contradicted by the record, and that kind of misapprehension of the record is arbitrary and capricious. But they did respond to the EPA. You're saying they just misunderstood what the EPA was saying. That's correct. There is a response in the record to the EPA, but they fundamentally misunderstood what EPA was saying and said that they were satisfied when, in fact, there's no evidence that they were. I see that I'm over my time, so unless there are further questions, we respectfully request that the Court vacate the certification. Thank you, Mr. Thiele. Good morning, Your Honors, and may it please the Court. I'm Erica Maley on behalf of the State Water Control Board and other Virginia agency respondents. I'd like to address in May the issue of the crossing locations. The Virginia agencies correctly interpreted Virginia law as providing that a state water protection permit cannot be used to alter the siting determinations previously made by FERC. Pipelines are long, contiguous projects. It's not possible for the agencies to require a change in the location of one crossing without that impacting the location of the pipeline elsewhere. As this Court recently discussed in the Wild Virginia decision, that means that siting determinations risk shifting environmental impacts or even worsening overall environmental impacts by avoiding an impact at one location at the expense of a worse impact at other locations. And that is why an effective environmental analysis of crossing locations has to consider all potential environmental impacts along the entirety of the pipeline route, including such questions as the length of the route, impact on sensitive resources, such as national parks and forests, and impact on endangered species, among a whole host of other questions. Those issues go far beyond the scope of a Virginia water protection permit, which considers only impacts on Virginia water quality and only impacts from construction activities in streams and wetlands. Is the denial of a certification the same as an altering of a siting determination? It depends on the grounds for the denial of the certification. We agree that provision doesn't say the agencies have to grant a certification. They still have the authority to deny a certification if they don't believe that the water quality standards will be met. But what it does provide to say don't alter the siting location is it changes how you conduct the analysis of whether the application is the least environmentally damaging practicable alternative. In other circumstances, that considers both what the agency calls on-site alternatives, how you're doing the construction, and off-site alternatives. For instance, if someone wanted to build a Walmart and that would require filling a wetland, the agency could say, well, couldn't you build your Walmart somewhere where you wouldn't be filling a wetland? And you'd have to go through that analysis of the environmental impacts and whether there are available practicable alternatives. Did this denial require altering the siting determination or not? Well, in this instance, they granted the certification. I'm sorry. So what is your position on whether the state of Virginia can alter the siting determination? They cannot alter the siting determination made by FERC. That doesn't mean, again, that they don't have authority to deny a certification if they find that the project is going to result in a degradation of Virginia water quality. If you have an instance where the construction can't be done in a way that protects water quality, they can say we're not going to certify this project. What about this language your opposing counsel pointed out, except for pipelines greater than 36 inches? In our view, that language is not part of what's cross-referenced back in such facilities. Such facilities are facilities that are regulated by FERC or the state corporation commission, not cross-referencing back except for ones greater than 36 inches. And what does except for ones greater than 36 inches go to? What's the point of that? It goes to when you require an individual permit versus a general permit. So that's in the prior sentence, and it says general permits shall be used for projects under the authority of FERC or the state corporation commission, which regulates Virginia utilities, water lines, sewer lines, things like that. And that's except if you have a pipeline greater than 36 inches. A pipeline greater than 36 inches has to be done under an individual permit rather than a general permit. And that was a change that was made in 2018, which was the same time the legislature added Section 81 to also require, essentially codify, the upland certification procedure that the agency... Is there any legislative history that would help us decipher this statute? Yes, I think the legislative history is helpful here because when the legislature is explaining what they wanted to do, they say they wanted to do essentially two things. And one is they wanted these projects to have to be done under individual permits, not general permits. And the second is they wanted that upland certification to be done for these large pipelines, which the agency was already doing. And they don't say anything about, oh, by the way, we also now want you to consider altering FERC siting determinations. The such facilities language, that language about not altering siting determinations, that was unchanged. So the question becomes, when they added the accept clause to the prior sentence, did they mean to change the meaning of that cross-reference? And I think the legislative history, as well as the overall statutory scheme, including Section 81, demonstrates that they didn't. Because at the same time they made that change to Section 21, they added Section 81, including they added that language in Section 81, again saying we do not want these proceedings to be used to alter FERC siting determinations. This tracks the genuine method of statutory interpretation, how you go about it. First, you have to determine whether that particular section is ambiguous. And I take it you are saying there is some ambiguity here. Therefore, the legislative history, which Virginia goes to, is something that supports your case. What about the crossing method here? Isn't there some requirement of an independent analysis? It doesn't look like there was much done here. Well, I would respectfully disagree both that there is an independent verification requirement and that there wasn't an independent analysis done here. But you disagree that there is a requirement that the agency should do an independent analysis. Under the Virginia regulation that applies, it's the applicant's burden to undertake the LEDPA, Least Environmentally Damaging Practical Alternative analysis. And the agency is to review whether the analysis set forth by the applicant is sufficient. And so that's why some of it is phrased in terms of, here are all the things the applicant considered. Because that's how that process works under the regulation. The applicant conducts the analysis. The agency reviews it and determines whether it meets the standards. So there isn't that requirement that the agency do some sort of independent verification. But also they did do a lot here. There were multiple meetings. There were multiple inquiries. They reviewed every one of the hundreds of crossings individually. Even though Virginia law only says you have to review the crossings with a drainage area of greater than five square miles. They did do an independent analysis here? They did a thorough... When you look at it, what they seem to have done is recounted these fact findings and didn't just adopt it. Well, again, that goes back to the Virginia regulation, which I can find the site for you. The Virginia regulation says that's 9 Virginia Administrative Code 25-210-80. And it says, again, it's the applicant's burden to conduct it. And the agency does a review of whether there's been an adequate demonstration for them to conclude that Virginia water quality is going to be conducted. So they don't have to do an independent verification in terms of you have to then go out and hire your own agency staffers to conduct yourselves all of the analysis that it's the applicant's burden to do. But they took a very close look at it. And they concluded that the factors that were part of that analysis were the proper factors to consider. And those include things like how deep would a bore be? How deep is the stream? Is there karst geology? And the petitioners don't have any arguments that those were not the correct factors to look at in determining what crossing methods are appropriate. And they don't even have any arguments that there's other important factors that ought to have gone into that crossing method analysis that the agencies didn't conclude. And if anything, their arguments appear to be based on a premise that boring is just generally preferable to trenching. And we should have required greater analysis to uphold decisions to trench streams. But that's not the agency's view. Whether boring is preferable or trenching is preferable just depends on the characteristics of the particular site. For instance, if you have a site that would require a deep bore pit, you're going to end up with a large spoil pile, essentially a big pile of dirt that has to be removed from the bore pit before the pipeline can be threaded through it. And especially if you have other site-specific constraints, such as a site with steep slopes, it can be very difficult to effectively contain that spoil pile. And so you can end up with a situation where it's eroding sedimentation into the waterways, and that's not good for the water quality. And so that's why those are the factors that the agencies were looking to in saying stream by stream, do we think they have shown that the crossing methods here are the appropriate crossing methods to use? The opposing counsel's point that Virginia didn't respond at all to their comment found it J.A. 1840. I think they did respond. Again, they're not going to go through and say, here is our response to each comment in the record with the number of comments, and there's just no requirement that they do that. But they did respond to comments that said there should have been more in-depth analysis or the analysis was inconsistent, and they disagree with that. And that's, for instance, in the presentation that the Department of Environmental Quality made to the board. Did they ever respond specifically to Ms. Silvas' comment that starts at J.A. 1840? That's the engineering criticism. Again, I don't think they responded to it by name, but they respond to the comments that the analysis was inconsistent, and that's discussed in the presentation to the board, and they say we found these factors to be applied in a consistent and logical fashion. That was the finding they made as to that. And again, it's something of a balancing analysis here. So it doesn't demonstrate an inconsistency to say you're always going to have a cutoff, that any time a bore depth goes below 40 feet, we're not going to bore. It's a combination of how deep do you have to bore, and what does the site look like? Because, again, one of the main considerations is can you safely contain that spoil pile? So on one site, maybe you can. On another site, no. And they did respond as well in depth to the EPA comments. And, again, EPA, those were comments EPA actually submitted to the Corps, but the agencies... I think opposing counsel's argument there is not that Virginia didn't respond, but that they misunderstood what the EPA was saying. What's your response to that? I think the response to that is that what they were looking for was to say, what has EPA identified in the crossing methodology where we think more information has been required? And what they identified was more information and more conditions that were needed in the mitigation analysis. And so that was what they required. Now, they're not purporting to say EPA is then going to find all of its concerns have been addressed. Again, the EPA is actually submitting those comments to the Corps, and the Corps proceeding is ongoing. So if EPA has remaining concerns, we would expect that they would address that with the Corps. But in terms of the agency's own analysis, those were the factors that they found that EPA had identified where they then said, we would like to see further analysis. And then that further analysis was provided by the applicant. In my remaining time, I would like to briefly discuss the jurisdictional question. The petitioners contend that jurisdiction exists here under Section 717R, but their interpretation of that section is overly capacious. The reference to agency actions pursuant to federal law doesn't extend to pure questions of state law. And that's really what you have here, especially if you look at their first argument. They're saying the state agency misinterpreted a state statute. And as my friend recognized, it's long been the rule under the Clean Water Act that a Clean Water Act certification that's challenged on state law grounds is considered in state court. And it's our position that 717R didn't intend to change that. And so for those reasons, we would ask that the court dismiss the petition or alternatively deny it. Is this new enlightenment that you've come to this conclusion about jurisdiction? We've been litigating these cases for a long time. Is this new enlightenment? It wasn't raised in previous cases, that's true. That's an understatement. It is. It's a somewhat new statute. And for instance, the Fifth Circuit case, the Shrimper's concurrence, I think is illuminating as to the jurisdictional issues here. So it's true that we hadn't raised this previously. But again, in every case, the parties in the court do have to do an analysis of jurisdiction. And in some of those prior cases, you may have federal issues. And if you have federal issues that arise with a Clean Water Act certification, those are appropriately in federal court. 717R? Yes, Your Honor. Wasn't that 2005? Yes, Your Honor. Why are you talking about something that just came up? Well, we're saying we haven't raised it previously. And there haven't been a large number. Yes. Well, this is something new. Maybe 2005 does sound new to someone my age, but I'm not sure it's new to you. But let me ask you on that because I think this jurisdictional issue goes to the heart of something else. It says pursuant to. It doesn't say applying solely to the federal law. Isn't that a distinction?  What's that, Your Honor? Do you really need to harp on this whole issue here? When you have that language there and it says pursuant to federal law, that's really the question here, not solely federal law. Well, the proceedings here, they're issuing a Clean Water Act certification pursuant to federal law, but they're also issuing a Virginia water protection permit pursuant to state law. And so if you look at JA1 that my friend was citing, it says pursuant to the Clean Water Act. And it also says pursuant to state water control law. So it is not a proceeding that's solely pursuant. If it is pursuant to federal law, do we have jurisdiction? I don't believe you have jurisdiction over the claims raised here, no. If the claims raised … Let me answer that question insofar as the general jurisdiction question. The statute says acting pursuant to federal law. So here you have agencies. Looks to me, and you can convince me otherwise, that they're acting pursuant to Section 401. They're acting pursuant to Section 401 in issuing the Clean Water Act certification, but they're acting pursuant to Virginia law in issuing the Virginia water protection permit. And the pipeline would have to obtain the Virginia water protection permit, even if the Clean Water Act didn't exist or accepted this project. That is an independent requirement of federal law. So the fact that it also serves as the Clean Water Act certification doesn't transform everything that happens into the proceeding in something that's done pursuant to federal law. And there is no argument here that, for instance, not evaluating crossing locations somehow violated the Clean Water Act. The Clean Water Act doesn't require that. Petitioners never argue that. If it's all about state law, then maybe you could alter it, alter FERC's citing determination if state law is what we need to look to. Well, it's a state law provision. It's a state statute that says that the state agency cannot alter the FERC's citing determinations. So that's why, in this case, that is a pure question of state law that ought to be in state courts. Thank you, Your Honors. Good morning. I may have pleased the Court. George Sibley for Mountain Valley Pipeline. I'd like to start first with just one point on the statutory interpretation point and whether Section 21D2 exempts these large pipeline projects or that the restriction there applies to these large pipeline projects. As my friend noted, the 2018 legislation does two things quite clearly. It directs for individual review of large pipelines, and it creates this upland review that previously that's what this Court reviewed in the 2018 decision, but that there previously had been no statutory grounding for that. And Judge Winn, you asked the question about ambiguity in resort to legislative history. I would suggest there's a step the Court could take before that, and that's to read the legislation as a whole, and in particular the actual individual review that's prescribed in subsection J of 21. Explain that to me. I've been grappling with this whole statutory interpretation. What is our view? Do we look back at the beginning of things? I know Virginia is pretty clear. If it's plain, that's the end of it. There's no step before ambiguity. If it's plain, you go with that meaning. But if it's ambiguous, that's when we go to intent of legislation. So what are you talking about? There's a step before ambiguity other than the plain. I think we actually agree with one another. I'm referring to not the finding of ambiguity, but the resort to legislative history as a way to resolve that ambiguity. I think there's a step. There's an intermediate step there, and that's to look to the words in the legislation as a whole. And in subsection J, the plain meaning, yeah. You're just saying look at the statute of plain meaning. But when you use it, look at the history of it, you are confusing me. Okay. I get off track when I get confused. Me too, Your Honor. I was simply saying the canon of interpretation, that you interpret the specific provision, D2, in light of the statute as a whole and certainly in light of the legislation that augmented the review here. And in subsection J, there are several powerful textual indicators that the legislature did not intend to mandate that the Department of Environmental Quality undertake this type of sweeping review. Among other things, they say that these individual crossings that they're supposed to evaluate are to be considered single and complete projects. So when you're looking at alternatives to the project, you're necessarily constrained to that particular location. Second, the legislature only asks that they consider certain of the crossings, those that drain an area of five square miles or greater. You simply cannot conduct a comprehensive siting analysis of the type that my friend described that involves a balancing of considerations across the entire project if you're only looking at a handful of crossings. With the balance of my time, I'd like to focus on the petitioner's arguments concerning Mountain Valley's demonstration that it had minimized impacts to the extent practicable. I think as is noted and as the court and my friend discussed, simply not correct that the agency blindly accepted what Mountain Valley submitted. There was an extensive process, and that's documented in the record. Ultimately, what is required for the agency in their decision document is to provide a clear and concise statement. Excuse me, what the board is supposed to provide is a clear and concise statement of its decision, and it provided that here. It adopted in full DEQ's fact sheet and the recommendation, and that recommendation and the fact sheet discuss at length this particular demonstration and all that the agency did to verify it. Now, Judge Thacker, with respect to the question you posed concerning the evaluation of this particular expert report, I think the best case on that is this panel's decision in the North Carolina case, which discusses the agency's burden in providing a description for a decision document, what it needs to include in the decision document. You recall in that case that the North Carolina Department of Environmental Quality denied Mountain Valley's request for a 401 water quality certification for the Southgate extension for the project, and the basis for that denial was the uncertainty over the mainline project. In response, part of Mountain Valley's petition in that case, we argued that the agency needed to consider one piece of evidence in the record more fully and explain it better. We had provided a chart that documented all the pending cases, and we wanted some sort of quantifiable metric to explain how the uncertainty there precluded them issuing a certification. And the court said that's not necessary. And we looked at the whole record, and there's ample evidence in the record here to support the underlying decision. And I think the same applies here. The issue about the practicability of alternatives was one of the most thoroughly discussed issues in the record. The agency did not directly address Ms. Silva's – I see I'm out of time. If I could briefly finish. The agency did not address the particular expert report, but Mountain Valley did. And that is in the record. And the court's duty, certainly under Virginia law and reviewing agency actions, we do think that provides a rule of decision, is to confirm that there is evidence in the record to support the agency's decision, and here there is. We think the court should deny the petition. Thank you. All right, thank you. Mr. Taney, you have it. Thank you, Mr. Chief Judge Gregory. A few points on rebuttal. Addressing jurisdiction quickly, I heard it proposed that the questions presented by the petition involve pure questions of state law. There can be no pure questions of state law for a Natural Gas Act facility, because those would be otherwise preempted. That Virginia Water Pollution Permit Program, the permit itself only exists because the Natural Gas Act preserves 401 authority. That's the only way that that applies. So there are no pure questions of state law. Everything is bound up with Section 401. Coming to the methods analysis, they do have a duty to independently analyze. Yes, it is the applicant's burden to provide the alternatives analysis, but that analysis must demonstrate to the satisfaction of the board, which requires the agencies then to take a look at it and verify it. And when there is contrary evidence in the record, that must be dealt with, even if Virginia law provides the rule of law. In the case of James v. City of Falls Church cited in the brief, a 2010 Virginia Supreme Court decision at 694 S.E.2.D. at 574, an agency action has to be vacated where it's issued without consideration or in disregard of facts or law. If there's contrary evidence in the record, it must be grappled with, and here it wasn't. And digging down, pardon the pun, on the crossing methods and the questions that Virginia was presenting about how deep the bore pit must be. And what contrary evidence are you saying was not grappled with? There were three things on methods. The contrary evidence in the Silvis Report, the inconsistent statements made by MVP over the years about whether, you know, whether first a crossing was unfeasible and then it was feasible, and then EPA's comments. Those three things were inadequately dealt with in the record. The Silvis Report, for example, calls out that there are 44 sites, 44 sites in Table 15, where Mountain Valley complained they didn't have room for spoil. Does inadequately dealing with them rise to the level of arbitrary and capriciousness? It does. In the case of the critical commentary and the credibility issues, there was a complete failure to address. And so, therefore, that is. And the critical commentary is the expert. Again, that is, yes, it's the Silvis Report of 1840. So that complete failure to address is arbitrary and capricious. It's also arbitrary and capricious. The opposing counsel said that, first of all, the state did address it, maybe not directly, but in an overarching way, and that MVP addressed it. Well, I would disagree that the record reflects that it was addressed by the agencies. And to the extent that MVP addressed it, the agencies did not adopt that rationale. You know, MVP provided a lot of responses to the comments, and I can't think of an example offhand. Do you want them to adopt MVP's rationale? Well, no, of course not. But we need them to explain either why they did or did not. I mean, that is simply the issue. For example, on the question of their credibility, MVP explained that, well, after we submitted that application to FERC and certified that it was true and correct, we determined that it was logistically difficult, even though they were technically practicable. Well, that explanation falls short because the whole question is whether it's practicable. So I don't think they could have explained that away or adopted it rationally. On EPA's comments, EPA wanted more information than just to consider the costs of mitigation. But when the board asked DEQ at the hearing, well, were EPA's comments addressed? The board, I'm sorry, the DEQ permit writer said, the main thing EPA wanted were costs, and I wasn't aware of anything else they wanted. But that's contradicted by the record. There is record evidence that they misapprehended what EPA wanted. And that's why you're saying they misunderstood EPA's comments. That's correct. That's correct. Because EPA didn't just want to understand the costs of mitigation. They wanted, they said that we do not think on this record these methods are the least environmentally damaging practical alternative. We need you to more thoroughly explain why you've rejected trenchless crossings, and we want further consideration of trenchless crossings at every location. And that was not provided. And DEQ missed that, instead focusing on this narrow question of mitigation costs. Quickly, with my remaining time, on the question of 21J raised by MVP's counsel, yes, that does provide that a single, that each crossing is a single and complete project. And that means that the avoidance and minimization requirements must be viewed through the lens on looking at that crossing. Not looking at its effect on the rest of the route, but whether that crossing, its location and its method, is the least environmentally damaging. And so I don't, to the extent that 21J informs the analysis, I don't think you need to get there, the language is plain on the meaning of alter. But to the extent that it informs the analysis, it suggests that it is looking at that narrow crossing, and not at the route overall. So for those reasons, we respectfully request that the court grant the petition and vacate the certification. Thank you, your honors. Thank you, Mr. Tinney. Thank you, counsel all, and appreciate your arguments.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker